**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**RONALD MILLER,**

              **Plaintiff,**              **CIVIL ACTION NO. 13-cv-11748**

       **v.**                 **DISTRICT JUDGE SEAN F. COX**

**COMMISSIONER OF**           **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

              **Defendant.**
_____/

**REPORT AND RECOMMENDATION**

      Plaintiff Ronald Miller seeks judicial review of Defendant Commissioner of Social Security's determination that he is not entitled to social security benefits for his physical and mental impairments under 42 U.S.C. § 405(g). (Docket no. 1.) Before the Court are Plaintiff's Motion for Summary Judgment (docket no. 15) and Defendant's Motion for Summary Judgment (docket no. 20). Plaintiff also filed a response to Defendant's motion. (Docket no. 22.) The motions have been referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Docket no. 3.) The undersigned has reviewed the pleadings, dispenses with a hearing pursuant to Eastern District of Michigan Local Rule 7.1(f)(2), and issues this Report and Recommendation.

**I.**      **RECOMMENDATION**

      For the reasons stated herein, Plaintiff's Motion for Summary Judgment (docket no. 15) should be GRANTED IN PART and DENIED IN PART, and Defendant's Motion for Summary Judgment (docket no. 20) should be DENIED. This matter should be remanded for clarification of

the identities of James White, NP, and James White, M.D., and a reassessment of Dr. White's

opinion in accordance with the results of that inquiry.

## II.    PROCEDURAL HISTORY

Plaintiff filed applications for a period of disability, disability insurance benefits, and

supplemental security income with a protective filing date of May 1, 2006, alleging disability

beginning February 1, 2006, due to "left leg/knee/foot problems." (*See* TR 201, 358.) The Social

Security Administration denied Plaintiff's claims on July 22, 2006, and Plaintiff requested a *de novo*

hearing. (TR 201.) On June 6, 2008, Plaintiff appeared with a representative and testified at the

hearing before Administrative Law Judge (ALJ) Kathryn D. Burgchardt. (TR 201, 209.) In a

December 1, 2008 decision, the ALJ found that Plaintiff was not entitled to benefits because he was

capable of performing a significant number of jobs in the national economy. (TR 201-09.) The

Appeals Council reviewed and vacated the ALJ's decision on the basis that the decision did not

contain an adequate evaluation of Plaintiff's alleged mental impairments; the ALJ's assessment of

Plaintiff's residual functional capacity (RFC) was not consistent with the record evidence and/or

made in accordance with the Social Security Regulations; and the decision did not explain how

Plaintiff could perform the jobs set forth by the vocational expert (VE) with the limitations listed

in Plaintiff's RFC. (TR 210-13.) The Appeals Counsel remanded Plaintiff's case to an ALJ with

instructions to resolve the above-cited issues by obtaining physical and mental consultative

evaluations for Plaintiff, further develop Plaintiff's vocational abilities, and obtain updated medical

records and evidence from a medical expert as appropriate. (TR 212-13.)

On remand, Plaintiff appeared with a representative and testified at a hearing before ALJ

Oksana Xenos on August 10, 2011. (TR 116, 126.) In a September 7, 2011 decision, ALJ Xenos

found that Plaintiff was not entitled to benefits because he was capable of performing a significant

number of jobs in the national economy. (TR 116-26.) The Appeals Council declined to review ALJ Xenos's decision (TR 1-7), and Plaintiff commenced this action for judicial review. The parties then filed cross motions for summary judgment, which are currently before the Court.

## III.   HEARING TESTIMONY AND MEDICAL EVIDENCE

### A.   Plaintiff's Testimony

Plaintiff was 50 years old at the time of the administrative hearing and 44 years old on the alleged onset date. (TR 125, 135.) Plaintiff testified that he was 5'10" tall and weighed 265 pounds. (TR 135.) He testified that he had a GED and had attended a trade school. (TR 135.) Plaintiff said that he lived with his two children, who were six and seven years old. (TR 135-36.) Plaintiff testified that he was not working at the time of the hearing, and he could not remember the last time he worked. (TR 136.) He added that he last worked as a bouncer for about fifteen years, but he stopped working because he hurt himself and couldn't do that type of work anymore. (TR 136.) Plaintiff claimed that he did not try to find a job without the physical demands of a bouncer because he didn't have the education to do so. (TR 136.)

Plaintiff explained that he was disabled because he had foot drop, nerve damage, hypertension, diabetes, a hand injury, and major depression. (TR 136.) Plaintiff elaborated that he wasn't able to function as he had in the past or do the work that he used to do. (TR 136.) He added that nobody was hiring and that he had been trying to find work, but when employers saw him walking with a cane and a foot brace, they would throw out his application. (TR 136.) Plaintiff testified that the most serious condition that prevented him from working was his left foot drop. (TR 138.) He said that he used a cane and a wore a foot brace daily to prevent his foot from getting caught on things, but the foot brace rubbed his skin raw. (TR 138-39.) Plaintiff testified that the cane was prescribed to him by a doctor. (TR 139.) Plaintiff testified that his depression was also

3

a serious condition that prevented him from working. (TR 139.)  He explained that he "just [didn't] feel the same" and that he cried a lot.  (TR 139.)  Plaintiff said that he took a lot of medication, but he wasn't sure which one was for his depression.  (TR 139.)  Plaintiff added that he suffered headaches as a side effect of his medication.  (TR 139.)

Plaintiff testified that since he stopped working, he spent his time talking to his kids and walking them to school.  (TR 140.)  Plaintiff added that he wasn't able to take his kids to school without having a lot of pain, so his brother bought him a truck for that purpose.  (TR 140-41.)  Plaintiff said that his mother drove him to the store.  (TR 141.)  Plaintiff testified that his children helped him with the housework, such as vacuuming, dishes, and laundry.  (TR 141-42.)  He stated that he did not do any yard work.  (TR 143.)  He claimed that he did not stay in touch with family and friends other than his children, his mother, and his brother.  (TR 142, 149.)  Plaintiff said that the church bus picked him and his children up every Sunday to attend church.  (TR 143.)  Plaintiff also admitted to helping his children with their homework.  (TR 143.)  Plaintiff said that he did not have any hobbies at the time of the hearing but that he used to bowl and go sailing, which he could no longer do.  (TR 143.)  He added that he couldn't even keep up with his kids anymore.  (TR 143.)  Plaintiff testified that he would lie down during the day.  (TR 145.)

When questioned by his attorney, Plaintiff explained that his depression caused him to eat a lot and gain weight.  (TR 148.)  He added that he was trying to lose the weight, but he couldn't because he couldn't exercise.  (TR 148.)  Plaintiff testified that he had very poor concentration, elaborating that he couldn't remember things that his kids told him or certain dates.  (TR 148.)  He added that he had short-term and long-term memory loss.  (TR 148.)  Plaintiff also testified that he had very low self esteem.  (TR 148-49.)  Plaintiff explained that his foot drop had caused him constant pain, which extended from his knee to the top of his foot, for five to six years.  (TR 150.)

4

He added that he suffered from back pain due to his foot drop, weight, and diabetes. (TR 150.) Plaintiff testified that his back and leg were "killing" him after standing in line for 45 minutes and that he had difficulty sitting. (TR 150-51.) Finally, Plaintiff testified that he wouldn't be able to perform a relatively easy job for eight hours a day, five days a week without missing more than two days per month because he couldn't stand anywhere for eight hours without lying down. (TR 151-52.)

### B.      Vocational Expert's Testimony

First, the vocational expert (VE) defined the region he would be using to respond to the ALJ's questions on available jobs as the State of Michigan, the tri-county area of Wayne, Macomb, and Oakland Counties, and the nation. (TR 152.)

The ALJ then asked the VE whether a hypothetical person of the same age, education, and work experience as Plaintiff who could perform work at the medium exertional level, but was limited to unskilled, routine, non-production-oriented work involving one- to two-step instructions; occasional contact with the general public, coworkers, and supervisors; and minimal changes in the work setting; who could occasionally lift up to fifty pounds and frequently up to twenty pounds; could stand up to six hours in eight with normal breaks; could sit six hours in eight with normal breaks; could walk up to six hours with normal breaks; could not climb ladders, ropes, or scaffolds; could occasionally climb stairs, balance, stoop, kneel, crouch, and crawl; could frequently reach, handle, finger, feel, push, and pull; could frequently operate foot or leg controls with his right lower extremity; could occasionally operate foot or leg controls with his left lower extremity; should avoid hazards such as moving machinery and unprotected heights; and could frequently operate a motor vehicle could perform any of Plaintiff's past work. (TR 152-53.) Plaintiff's attorney objected to this hypothetical as unsupported by the record, which the ALJ took under consideration. (TR 153.)

5

The VE responded that such an individual could not perform Plaintiff's past work but that he could perform unskilled work as a hand packager at an SVP of two, for which there were 26,000 positions available in the State of Michigan; 12,000 available in the tri-county area, and 758,000 available in the nation.  (TR 153-54.)

The ALJ then asked the VE if the number of jobs available would change, assuming all of the prior restrictions, except that the individual could only walk up to two hours in eight.  (TR 154.) Plaintiff's attorney voiced the same objection.  (TR 154.)  The VE testified that the number of available jobs would be reduced to 10,000 in the State of Michigan, 5,000 in the tri-county area, and 100,000 in the nation.  (TR 154.)

Next, the ALJ asked whether there would be any jobs available to that same hypothetical person, assuming all of the above restrictions, but limiting the person to work at the light exertional level. (TR 154.) After Plaintiff's attorney objected, the VE responded that such an individual would be able to perform work as an office helper with an SVP of two, for which there were 3,400 available jobs in the State of Michigan, 1,400 jobs available in the tri-county area, and 122,000 available nationally; and a locker room attendant with an SVP of two, for which there were 1,500 jobs available in the State of Michigan, 750 in the tri-county area, and about 50,000 available nationally.  (TR 154-55.)

The ALJ then asked the VE whether any jobs would be available to that individual if he required a cane to ambulate and could not operate foot or leg controls with his left lower extremity. (TR 155.)  Plaintiff's attorney objected, the VE testified that those additional limitations would preclude employment, and Plaintiff's attorney withdrew his objection.  (TR 155.)  The ALJ subsequently asked the VE whether there would be any jobs available to the same individual at the sedentary level.  (TR 155.)  The VE testified that there would be limited surveillance monitor

positions available at an SVP of two, for which there were 500 in the State of Michigan, 250 in the tri-county area, and about 25,000 in the nation. (TR 155-56.)

Lastly, the ALJ asked the VE whether any jobs would be available to the hypothetical person, assuming that due to frequent episodes of pain, depression, memory deficits, and a combination of other impairments, he would be off task twenty percent or more of the day and could not sit, stand, or walk a total of eight hours a day, five days a week on a regular and continuing basis. (TR 156.) The VE answered in the negative. (TR 156.)

Plaintiff's attorney then asked the VE whether medium and light work would be precluded if an individual and his treating physician indicated that the individual was markedly limited in the ability to complete a normal work day and work week and the ability to perform at a consistent pace and would require four or more rest periods. (TR 156-58.) The VE responded that employment would be precluded under those circumstances. (TR 158.) Also, upon request from Plaintiff's attorney, the VE confirmed that a GAF of 50 would preclude all jobs. (TR 158.)

### C.     Medical Record

The undersigned has thoroughly reviewed Plaintiff's medical record. In lieu of summarizing Plaintiff's medical history, the undersigned will make references and citations to the record as necessary in response to the parties' arguments.

## IV.    ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of February 1, 2006, and that Plaintiff suffered from the following severe impairments: left foot drop, degenerative joint disease, hypertension, non-insulin-dependent diabetes, obesity, a history of polysubstance abuse, and depression. (TR 118.) The ALJ also found, however, that Plaintiff's impairments did not meet or medically equal the severity of an impairment listed in 20

C.F.R. Part 404, Subpart P, Appendix 1.  (TR 119-20.)  The ALJ then found that Plaintiff had the following residual functional capacity:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), but he is limited to unskilled, routine, non-production-oriented work with occasional contact with the general public, coworkers, and supervisors and minimal changes in the work setting; can stand up to six hours in eight with normal breaks; can walk up to two hours in eight with normal breaks; can sit up to six hours in eight with normal breaks; cannot climb ladders, ropes, or scaffolds; can occasionally climb stairs, balance, stoop, kneel, crouch, and crawl; can frequently reach, handle, finger, feel, push, and [p]ull; can frequently operate foot/leg controls with his right lower extremity; can occasionally operate foot/leg controls with his left lower extremity; should avoid hazards, such as moving machinery and unprotected heights; and can frequently operate a motor vehicle.

(TR 120-24.)  Subsequently, in reliance on the VE's testimony, the ALJ determined that Plaintiff was capable of performing a significant number of jobs in the national economy.  (TR 125-26.) Therefore, the ALJ found that Plaintiff was not disabled under the Social Security Act at any time from February 1, 2006, through the date of the ALJ's decision.  (TR 126.)

## V.   LAW AND ANALYSIS

### A.    Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions.  Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997).  Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528.  It is not the function of this Court to try cases *de novo*, resolve conflicts

in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### B.    Framework for Social Security Determinations

Plaintiff's Social Security disability determination was made in accordance with a five-step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1)    Plaintiff was not presently engaged in substantial gainful employment; and

(2)    Plaintiff suffered from a severe impairment; and

(3)    the impairment met or was medically equal to a "listed impairment;" or

(4)    Plaintiff did not have the residual functional capacity (RFC) to perform relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(f). If Plaintiff's impairments prevented Plaintiff from doing past work, the Commissioner, at step five, would consider Plaintiff's RFC, age, education, and past work experience to determine if Plaintiff could perform other work. If not, Plaintiff would be deemed disabled. *See id.* at § 404.1520(g). The Commissioner has the burden of proof only on "the fifth

9

step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

### C.    Analysis

The Social Security Act authorizes "two types of remand: (1) a post judgment remand in conjunction with a decision affirming, modifying, or reversing a decision of the [Commissioner] (a sentence-four remand); and (2) a pre-judgment remand for consideration of new and material evidence that for good cause was not previously presented to the [Commissioner] (a sentence-six remand)." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994) (citing 42 U.S.C. § 405(g)). Under a sentence-four remand, the Court has the authority to "enter upon the pleadings and transcript of the record, a judgment affirming, denying, or reversing the decision of the [Commissioner], with or without remanding the cause for a hearing. 42 U.S.C. § 405(g). Where there is insufficient support for the ALJ's findings, "the appropriate remedy is reversal and a sentence-four remand for further consideration." *Morgan v. Astrue*, 10-207, 2011 WL 2292305, at *8 (E.D.Ky. June 8, 2011) (citing *Faucher*, 17 F.3d at 174).

Plaintiff asserts that this matter should be reversed and remanded under sentence four because the ALJ rejected the assessments of every doctor who examined or treated Plaintiff's mental impairments without good reason; violated the treating physician rule; and failed to consider the impact of Plaintiff's obesity. (Docket no. 15 at 1-2.)

1.    *The ALJ's Assessment of the Medical Opinions*

Plaintiff asserts that the ALJ's assessment of the medical opinion evidence regarding his mental impairments is not supported by substantial evidence and that it, in part, violates the treating physician rule.  The ALJ must give a treating physician's opinion complete deference if it is supported by clinical and laboratory diagnostic evidence and it is not inconsistent with the other substantial evidence in the record.   20 C.F.R. § 404.1527(c)(2).  It is equally well settled that the ultimate issue of disability is reserved to the Commissioner and not the treating or examining physician.  *Kidd v. Comm'r*, 283 Fed. Appx. 336, 341 (6th Cir. 2008).  Thus, when a medical or non-medical source offers an opinion on "an issue reserved to the Commissioner, such as whether the claimant is disabled, the ALJ need not accord that opinion controlling weight."  *Id.* (citing *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007)).  The opinion of an examining source is generally accorded more weight than is the opinion of a source who did not examine the claimant.  20 C.F.R. § 404.1527(c)(1).  The opinion of a state agency medical or psychological consultant is reviewed in the same manner as is the opinion of a nonexamining physician or psychologist.  20 C.F.R. §404.1527(e).

The Commissioner requires its ALJs to "always give good reasons in [their] notice of determination or decision for the weight [they] give [a] treating source's opinion."  20 C.F.R. § 404.1527(c)(2).  Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *5 (1996)).  "'The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases,' particularly in situations where a claimant knows that his

11

physician has deemed him disabled and therefore 'might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id*. (quoting *Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999)).

If the opinion of a treating source is not afforded controlling weight, an ALJ must apply certain factors in determining what weight to give the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Wilson*, 378 F.3d at 544 (citation omitted). Even then, a finding that a treating-source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to controlling weight, not that the opinion should be rejected. SSR 96-2p, 1996 WL 374188, at *4.

The Sixth Circuit has upheld the decision of an ALJ which gave less than controlling weight to a treating physician without specifically analyzing the factors set forth in 20 C.F.R. § 404.1527(c) where the ALJ provided "good reason" for the decision. *See Infantado v. Astrue*, 263 Fed.Appx. 469, 473-74 (6th Cir. 2008). There is no per se rule that requires an articulation of each of the six regulatory factors listed in 20 C.F.R. § 404.1527(c)(2)-(6). *Norris v. Comm'r*, No. 11-11974, 2012 WL 3584664, at *5 (E.D. Mich. Aug. 20, 2012) (citing *Tilley v. Comm'r*, 394 Fed. Appx. 216, 222 (6th Cir. 2010)). Yet, "a failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007).

12

The Sixth Circuit has suggested, however, that an ALJ's failure to discuss the factors of §
1527(c)(2)-(6) may constitute harmless error (1) if "a treating source's opinion is so patently
deficient that the Commissioner could not possibly credit it;" (2) "if the Commissioner adopts the
opinion of the treating source or makes findings consistent with the opinion;" or (3) "where the
Commissioner has met the goal of [Section 1527(c)]—the provision of the procedural safeguard of
reasons—even though she has not complied with the terms of the regulation." *Nelson v. Comm'r*,
195 Fed. Appx. 462, 470 (6th Cir. 2006) (citing *Wilson*, 378 F.3d at 547).

Plaintiff takes issue with the ALJ's assessment of four medical opinions regarding his mental
impairments provided by Dr. David Vila, M.D. on May 12, 2008, Dr. James White, M.D. on
February 11, 2011, Dr. Luzbella Imasa, M.D. on March 30, 2011, and Karen Jordan, MSW, on July
18, 2011.

> a.      Dr. David Vila, M.D.

Dr. David Vila, M.D., of Southwest Counseling and Development Services, performed a
psychiatric evaluation of Plaintiff on May 12, 2008. (TR 438-39.) Dr. Vila diagnosed Plaintiff with
"Major Depression, recurrent, moderate;" "Polysubstance Abuse, crack, alcohol, and marijuana in
remission x 15 years;" hypertension; and a GAF score of 50. Dr. Vila opined that Plaintiff's
prognosis was guarded. He prescribed Plaintiff Paxil and Desyrel and recommended that Plaintiff
follow up with him in a month. Notably, Dr. Vila did not opine regarding Plaintiff's functional
abilities except for assigning him a GAF score of 50. Plaintiff asserts that the ALJ conceded that
a GAF score of 50 would disable Plaintiff (docket no. 15 at 25); however, she conceded no such
thing. In discussing the GAF score that Dr. Vila assigned to Plaintiff, the ALJ noted that a GAF
score from 41 to 50 is indicative of "serious symptoms (e.g., suicidal ideation, severe obsessional
rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning

13

(e.g., no friends, unable to keep a job)." (TR 123 (quoting DSM-IV, 4th Ed., p. 32).) The ALJ then found that Dr. Vila's assessment of Plaintiff's GAF score was not proportionate with Plaintiff's recitation of his activities and social functioning and assigned it limited weight. (TR 123.) The ALJ cited Plaintiff's testimony and May 23, 2006 function report in reasoning that Plaintiff took his children to school, socialized with family and friends, and attended church on Sunday and Wednesday. (TR 123.)

While case law from various districts around the country indicates a significant reliance on GAF scores, the Eastern District of Michigan has not followed that trend. *See Pellow v. Astrue*, No. 09-11587, 2010 WL 1626396, at *5 (E.D. Mich. Mar. 31, 2010) (Morgan, M.J.) ("Plaintiff's GAF scores are a relevant part of her mental health history, but the GAF scores are by no means controlling, nor is there any law, regulation, or controlling case law that requires that the scores receive significant weight in the ALJ's evaluation of her residual functional capacity."); *Blavatt v. Comm'r of Soc. Sec.*, No. 10-10930, 2011 WL 836805, at *9 (E.D. Mich. Feb 4, 2011) (Randon, M.J.) ("[T]he Sixth Circuit has observed, 'no statutory, regulatory, or other authority requir[es] the ALJ to put stock in a GAF score.'") (quoting *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006) (modification in original); citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)). Therefore, the undersigned recommends denying Plaintiff's Motion with regard to the ALJ's assessment of Dr. Vila's opinion.

b.      Dr. James White, M.D.

Dr. James White, M.D. completed a mental residual functional capacity assessment of Plaintiff on February 11, 2011. (TR 549-51.) Dr. White concluded that Plaintiff was markedly limited in several aspects, such as his ability to understand, remember, and carry out detailed instructions; his ability to maintain attention and concentration for extended periods; his ability to

14

complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; his ability to interact appropriately with the general public; and his ability to adapt to various situations. The ALJ assigned Dr. White's opinion limited weight because Plaintiff was able to take his children to school and help them with their homework, attend church twice a week, read a lot, watch television, listen to music, and socialize with family and friends. (TR 123-24.)

Plaintiff asserts that Dr. White is his treating psychiatrist. (Docket no. 15 at 24.) Defendant contends that there is no record evidence that Dr. White had an ongoing treatment relationship with Plaintiff at the time he completed his February 2011 assessment, as the assessment appears to be the only piece of evidence from Dr. White in the record. (Docket no. 20 at 19.) The ALJ pointed out that Plaintiff received treatment for his left ankle, affective disorders, and diabetes from James White, NP, from October 2009 through February 2011. (TR 123 (citing TR 537-48).) The undersigned has reviewed the treatment records from James White, NP, and the mental RFC assessment completed by James White, M.D., and notes that their signatures are substantially similar to one another. While not impossible, it is unlikely that Plaintiff was treated and evaluated by two different medical providers named James White during the same time period. Under these circumstances, the undersigned finds that the record is unclear regarding whether James White, NP, and James White, M.D., are in fact the same person, and if so, whether he is a nurse practitioner or a medical doctor. The answers to these questions would determine whether Dr. White is Plaintiff's treating psychiatrist and are necessary for the Court to conduct a meaningful review of the ALJ's assessment of Dr. White's opinion. Thus, the undersigned recommends that this matter be remanded for clarification of the identities of James White, NP, and James White, M.D., and a reassessment of Dr. White's opinion in accordance with the results of that inquiry.

c.      Dr. Luzbella Imasa, M.D.

Plaintiff met with consultative examiner, Dr. Luzbella Imasa, M.D., on March 30, 2011.  (TR

483-89.)  The ALJ discussed Dr. Imasa's opinion in relevant part as follows:

> After the examination, the claimant was diagnosed with major depressive disorder,
> a history of polysubstance dependence in remission; and a GAF of 50.  The
> consultant also completed a mental residual functional capacity assessment and
> indicated that the claimant had a marked limitation in the ability to carry out complex
> instructions and respond appropriately to usual work situations and to changes in a
> routine work setting.  The GAF assessment of 50 is not proportionate with the
> recitation of the claimant's activities and social functioning, and it is given limited
> weight.  The claimant testified that he takes his children to school, he socializes with
> family and friends, and he also indicated that he attends church on Sunday and
> Wednesday.

(TR 123.)  The ALJ did not assign any weight to Dr. Imasa's opinion regarding Plaintiff's

limitations other than the GAF score she assigned to Plaintiff.  As Defendant points out, however,

the ALJ's RFC assessment is consistent with Dr. Imasa's opinion regarding Plaintiff's marked

limitations.  (Docket no. 20 at 16-17, 18-19.)  Particularly, the ALJ limited Plaintiff to unskilled,

routine, non-production-oriented work with minimal changes in the work setting.  (TR 120.)

Plaintiff challenges the fact that the ALJ assigned limited weight to Dr. Imasa's assessment of

Plaintiff's GAF score and her reasons for doing so.  (Docket no. 15 at 22-23.)  Nevertheless,

Plaintiff's argument fails for the same reasons as his argument regarding Dr. Vila's assessment of

Plaintiff's GAF score, discussed *supra*.  Accordingly, Plaintiff's Motion should be denied with

regard to the ALJ's assessment of Dr. Imasa's opinion.

d.      Karen Jordan, MSW

Plaintiff treated with Karen Jordan, MSW, from December 16, 2009, through July 25, 2011.

(TR 566-73.)  On July 18, 2011, Ms. Jordan completed a mental residual functional capacity

assessment of Plaintiff.  (TR 562-65.)  In assessing Plaintiff's mental RFC, Ms. Jordan found that

16

Plaintiff had the same marked limitations as those found by Dr. White, as well as marked limitations in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances and his ability to work in coordination or in proximity to others without being distracted by them.  The ALJ assigned limited weight to Ms. Jordan's opinion, citing to Plaintiff's same daily activities as she did in discounting Dr. White's opinion. (TR 124.)  The ALJ also assigned Ms. Jordan's opinion limited weight because she was not a licensed psychiatrist or psychologist.  (TR 124.)

Plaintiff argues that the ALJ improperly discounted Ms. Jordan's opinion because Ms. Jordan treated Plaintiff as a psychotherapist.  (Docket no. 15 at 25.)  He then suggests that Ms. Jordan is, therefore, included in the Social Security Administration's definition of licensed or certified psychologists.  (*Id.* (citing 20 C.F.R. § 416.913(a)).)  Defendant counters that Ms. Jordan does not fall under the definition of a licensed or certified psychologist and that the ALJ properly discounted Ms. Jordan's opinion partly because she was not an acceptable medical source.  (Docket no. 20 at 20-21.)  Ms. Jordan is a social worker with a Master's Degree in Social Work.  Therefore, her opinions and assessments are not opinions from an acceptable medical source as defined in the regulations.  20 C.F.R. §§ 404.1513(a), 416.913(a).  Because a social worker is not an acceptable medical source, the ALJ can consider her opinion as evidence from an "other" medical source, but she is not required to accord the opinion any special weight or consideration. *Taylor v. Comm'r of Soc. Sec.*, No. 1:11-cv-46, 2012 WL 1029299, at *6 (W.D. Mich. Mar. 26, 2012) (citing 20 C.F.R. § 404.1513(d)(1)).  Thus, the ALJ did not err in assigning limited weight to Ms. Jordan's opinion.

### 2.     The ALJ's Consideration of Plaintiff's Obesity

Plaintiff asserts that while the ALJ determined that he had a severe impairment of obesity, she did not properly consider the impact of Plaintiff's obesity in her decision.  (Docket no. 15 at 37-

17

38.)  In support of this contention, Plaintiff relies on SSR 02-1p, which discusses obesity as a risk factor for other impairments.  (*Id.*)  SSR 02-1p classifies individuals with regard to obesity by considering their Body Mass Index (BMI).  SSR 02-1p, 2002 WL 34686281, at *2 (Sept. 12, 2002).  Individuals with a BMI greater than or equal to 30 are considered "obese," with those above a BMI of 40 having the most "extreme" type of obesity with the greatest risk for developing obesity-related impairments.  *Id*.  In evaluating the effects of obesity, SSR 02-1p "does not mandate a particular mode of analysis," but it does "direct[] an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation."  *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (citation and internal quotation marks omitted).  In step two of the sequential evaluation process, the ALJ noted that Plaintiff weighed 268 pounds and stood 5 feet 10 inches tall, making his BMI 38.4, which indicates obesity under the National Institutes of Health guidelines.  (TR 119.)  The ALJ then acknowledged that she must consider Plaintiff's obesity to determine if it, alone or in combination with other impairments, significantly limited Plaintiff's physical or mental ability to do basic work activities.  (TR 119.)  Nevertheless, the ALJ did not discuss or even mention Plaintiff's weight at any subsequent step of her analysis.

Defendant argues that the ALJ "satisfied her obligation to consider Plaintiff's obesity by giving significant weight to the medical source opinions of consultative examiner Dr. Sonia Ramirez and reviewing physician Dr. Mohammad Azimi, both of whom explicitly acknowledged Plaintiff's obesity and nevertheless assessed fewer restrictions than the ALJ included in her RFC assessment."  (Docket no. 20 at 12.)  Defendant also points to the fact that the ALJ discounted consultative examiner Dr. Ernesto Bedia's opinion, who also acknowledged Plaintiff's obesity, because the ALJ determined that Plaintiff had more restrictions than those assessed by Dr. Bedia.  (*Id*. at 12-13.)  In general, it is not enough for Defendant to suggest that the ALJ might have considered Plaintiff's

18

obesity – the ALJ is required to actually do so.  But "the ALJ does not need to make specific mention of obesity if he credits an expert's report that considers obesity." *Bledsoe v. Barnhart*, 165 F. App'x 408, 412 (6th Cir. 2006); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 443 (6th Cir. 2010).

Here, the ALJ discussed the expert opinions of Drs. Ramirez, Azimi, and Bedia, all of whom (Defendant argues) "acknowledged Plaintiff's obesity." (Docket no. 20 at 12-13.) First, with regard to Dr. Ramirez's report, while she does note that Plaintiff's abdomen was obese, there is nothing in her report to suggest that she considered Plaintiff's obesity when opining on Plaintiff's functional limitations. (*See* TR 412-19.)  Moreover, contrary to Defendant's assertion that the ALJ afforded Dr. Ramirez's opinion significant weight, in fact, the ALJ did not provide how much, if any, weight she assigned to it. (*See* TR 122.)  This same analysis applies to Dr. Bedia's report, except that the ALJ gave only limited weight to Dr. Bedia's opinion because she found Plaintiff to be more restricted. (*See* TR 466-81; TR 123.)  Dr. Azimi pronounced Plaintiff's obesity as a secondary diagnosis and based his conclusions regarding Plaintiff's exertional limitations on Plaintiff's weight and height, among other things. (TR 422-23.) The ALJ assigned  significant weight to Dr. Azimi's opinion, except for the postural limitations, as the ALJ felt that additional restrictions were warranted in that area. (TR 122.)

Thus, although the ALJ only directly discussed Plaintiff's obesity in step two of the sequential evaluation process, by crediting Dr. Azimi's opinion in the formulation of Plaintiff's RFC, the ALJ indirectly incorporated the effect of Plaintiff's obesity on his ability to work into his RFC.  The undersigned finds that the ALJ adequately considered Plaintiff's obesity in accordance with SSR 02-1p, *Bledsoe*, and *Coldiron*, and recommends that Plaintiff's Motion be denied in this regard.

19

### 3.     *Plaintiff's Introduction of New Evidence*

Plaintiff cites to several pieces of medical evidence regarding his physical impairments dated from December 4, 2011 to April 30, 2012, to support his claim for benefits.  (Docket no. 15 at 34-36.)  As Defendant notes, this evidence was generated after the ALJ's September 7, 2011 decision.  (Docket no. 20 at 7-8.)  In cases where, as here, the Appeals Council declines to review the ALJ's decision, judicial review is limited to the evidence that was part of the record before the ALJ.  *Cotton v. Sullivan*, 2 F.3d 692 (6th Cir. 1993); *Casey v. Sec'y*, 987 F.2d 1230, 1233 (6th Cir. 1993); *Wyatt v. Sec'y*, 974 F.2d 680, 685 (6th Cir. 1993).  "The district court can, however, remand the case for further administrative proceedings in light of the evidence, if a claimant shows that the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding."  *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) (citation omitted).  Plaintiff has not shown good cause for failing to present this new evidence to the ALJ; therefore, the Court will not consider it as part of Plaintiff's appeal.

### 4.     *Plaintiff's Use of a Cane*

Plaintiff suggests that the ALJ erred by failing to include Plaintiff's use of a cane as a limitation in her assessment of Plaintiff's RFC.  (Docket no. 15 at 36-37.)  As Defendant points out, however, Drs. Ramirez, Azimi, and Bedia all opined that Plaintiff did not need a walking aid to ambulate.  (Docket no. 20 at 16 (citing TR 418, 423, 474).)  The ALJ properly relied on these opinions in formulating Plaintiff's RFC; thus, Plaintiff's Motion should be denied with regard to this issue.

## VI.     CONCLUSION

For the reasons stated herein, the undersigned recommends that Plaintiff's Motion for Summary Judgment (docket no. 15) be GRANTED IN PART and DENIED IN PART, Defendant's

Motion for Summary Judgment (docket no. 20) be DENIED, and this matter be remanded for clarification of the identities of James White, NP, and James White, M.D., and a reassessment of Dr. White's opinion in accordance with the results of that inquiry.

## REVIEW OF REPORT AND RECOMMENDATION

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: February 17, 2015          s/ Mona K. Majzoub
                                  MONA K. MAJZOUB
                                  UNITED STATES MAGISTRATE JUDGE

21

**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: February 17, 2015             s/ Lisa C. Bartlett
                                     Case Manager